E-FILED
Tuesday, 02 May, 2006  11:40:09 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | |
|---|---|
| YONG-QIAN SUN, ) | |
| Plaintiff, ) | |
| v. ) | Case No. 03-2221 |
| ) | |
| BOARD OF TRUSTEES OF THE ) | |
| UNIVERSITY OF ILLINOIS, RICHARD ) | |
| HERMAN, DAVID E. DANIEL, ROBERT ) | |
| AVERBACK, JOHN H. WEAVER, IAN ) | |
| M. ROBERTSON, AND JOSEPH E. ) | |
| GREENE, ) | |
| Defendants. ) | |

## OPINION

This case is before the court for ruling on the Amended Motions for Summary Judgment filed by Defendants, Board of Trustees of the University of Illinois, Richard Herman, David E. Daniel, Robert Averback, John H. Weaver, Ian M. Robertson, and Joseph E. Greene, and related motions. Following this court's careful consideration of the arguments of the parties and the voluminous documents provided by the parties, this court rules as follows: (1) Defendants' Amended Motions for Summary Judgment (#97, #98, #99, #100, #101, #102, #103) are GRANTED; (2) Defendants' Motion to Strike Plaintiff's Affidavit (#123) is DENIED as moot; (3) Plaintiff's Motion to Strike Portions of the Reply of Defendants Greene and Board of Trustees (#125) is DENIED as moot; and (4) Defendant Herman's Motion to Amend Reply (#127) is GRANTED. Because the Amended Motions for Summary Judgment have been granted, the Motions in Limine (#130, #131, #132, #133, #134, #135, #136, #137, #138, #139) filed by the parties are MOOT.

FACTS[1]

Plaintiff, Yong-Qian Sun, is of the Asian race and his national origin is the People's Republic of China.  On August 21, 1997, Plaintiff was hired as an assistant professor at the University of Illinois.  Plaintiff was employed in the Department of Materials Science and Engineering, which is a Department in the College of Engineering.  Assistant professors are on a tenure track and are evaluated in the fifth year of their employment for promotion to associate professor with tenure.  If a decision to deny promotion and tenure is made, the assistant professor is issued a notice of nonreappointment, and the professor's employment is ultimately terminated.  Plaintiff was considered for tenure during the 2002-2003 academic year.  At that time, Defendant John Weaver was Department Head and Defendant David Daniel was Dean of the College of Engineering. Defendants Robert Averback, Joseph Greene and Ian Robertson were tenured faculty members in the Department.  Defendant Richard Herman was the Provost, or Chief Executive Officer, of the faculty for the University.

In 2001, Plaintiff received the Donald Burnett Teacher of the Year Award.  This award was given each year to reward excellence in undergraduate teaching in the Department.  The recipient received a monetary award of about $8,000 that was funded by Burnett, an alumnus of the Department.  The winner of the award was announced in College and Department publications.  In April 2002, the award winner was chosen by the two previous winners, Plaintiff and Pascal Bellon, who received the award in 2000.  Professors who were recent recipients of the award were not eligible to receive the award.

---

[1]  The facts set out in this case are taken from the Statements of Undisputed Facts provided by the parties, as well as from the documents submitted by the parties.

Plaintiff testified that Weaver had suggested to Plaintiff that he be considered for the award. However, in April 2002, Plaintiff and Bellon selected Averback as the winner of the award based upon his ranking in the Instructor and Course Evaluation System.  On April 9, 2002, Plaintiff sent an e-mail to Weaver recommending that Averback be given the Burnett award.  According to Plaintiff, Weaver was extremely upset with Plaintiff because Weaver was not selected for the award. Plaintiff testified that Weaver's attitude toward him changed dramatically after Weaver was not selected for the award.  Prior to this time, Weaver was very positive toward Plaintiff and had even nominated Plaintiff for a prestigious research award.  Plaintiff testified that, after the award winner was selected, in May 2002, Weaver informed him that he would no longer have access to income generated by his teaching of online courses.  Plaintiff was the only member of the Department who taught online courses, so Weaver's decision to change the policy on online courses only affected Plaintiff.  Because of Plaintiff's problems with Weaver, Plaintiff and Bellon had a discussion with Phil Geil and Ken Schweizer, who received the award in 1999 and 1998 respectively.  They decided that, in the future, the winner of the Burnett award would be selected by the previous four winners of the award, rather than the previous two.

It was the primary responsibility of the Department's Promotion and Tenure Committee to prepare and collect information about tenure candidates.  This responsibility consisted of obtaining certain biographical information from the candidate, choosing external evaluators and obtaining a written evaluation from the chosen external evaluators, and compiling internal evaluations of the candidate's teaching, research, and public service.  The information needed for making the tenure recommendation was compiled in a document known as a dossier.

In the spring of 2002, the members of the Department's Promotion and Tenure Committee

who were involved in the preparation of materials for Plaintiff's dossier were Defendants Averback and Greene, as well as David Payne and Ken Schweizer.  Averback was acting as chairman of the committee for the first time.  In addition to being on the committee, Greene was also the Director of the Materials Research Laboratory (MRL) which received block funding from the United States Department of Energy which ranged from $8 to $9 million per year.  As Director, Greene had budget authority over this block grant money and was considered powerful and influential by some members of the faculty because he controlled the research funding for a large number of professors in the Department.  On May 15, 2002, Greene said at a faculty meeting that he would not take any Chinese graduate students and that he would not interview them.  Following the meeting, Weaver asked Greene about the comment.  Greene said it was a stupid remark and that, while he had personal issues with human rights abuses by the Chinese government, he had no problems dealing with Chinese people.  Greene testified that this was a "throwaway remark" made to express his dissatisfaction with the length of a discussion on the Department's recruitment of international students, including those from Asia.  It is undisputed that, in fact, Greene had previously accepted and worked with two Chinese graduate students.

Greene's remark resulted in an exchange of e-mails, including an e-mail from Weaver to all of the professors in the Department which stated "Friends, This is to reaffirm something that should be part of our department culture–that we welcome people from all lands, of all backgrounds, and that we seek to provide a supportive atmosphere for them to do the best work that they can."  Weaver stated that this was true for "undergraduates, graduate students, postdocs, faculty, staff, and visitors" and that this was "important."  Greene responded with an e-mail which stated that "[w]e should have agreed upon departmental [guidelines] (not strict numbers!) regarding the fraction of

US/foreign graduate students we admit.  I suggest that a reasonable goal would be 2/3 US and 1/3 foreign with a 'maximum' of 50% foreign (emphasis in original)."

In the spring of 2002, the Department Promotion and Tenure Committee placed Averback in charge of obtaining external evaluators for Plaintiff.  This task was governed to a large degree by Provost Communication No. 9, a lengthy and detailed document which set out instructions for preparing promotion papers.  The document included guidelines and procedures for obtaining external evaluations.  Communication No. 9 provides that letters from at least four scholars or professional specialists outside the University are required for each nominee.  It also provides that the letters must be appropriate in several dimensions, including that they must be sufficient in number, from appropriately selected individuals at peer institutions, from individuals of appropriate rank, and from objective evaluators without conflicts of interest.  Communication No. 9 provides that the candidate must be provided with an opportunity to nominate external evaluators but that the department must also seek letters from evaluators other than those suggested by the candidate. Communication No. 9 states that a "majority of the external evaluations should come from the department's, rather than the candidate's, nominations" and that the department should "obtain a slightly larger number of opinions" from persons not nominated by the candidate.  Communication No. 9 also states that the "candidate has no privilege of vetoing external reviewers, but may indicate individuals whom he or she considers inappropriately biased."  However, the "candidate cannot reasonably request avoidance of more than one or two individuals."  Communication No. 9 states that the person obtaining the external evaluations should be "selective in choosing evaluators." Communication No. 9 states that  the external evaluations "are critical components of the dossier and play a major role in the decision-making process."  The identity of the external evaluators is

confidential and not disclosed to the tenure candidate.

On May 21, 2002, Plaintiff suggested, in writing, five external evaluators. Averback testified that he determined that three of the evaluators suggested by Plaintiff were inappropriate because they were from outside of the University's peer rank. It is undisputed that the Department is one of the highest ranked departments of its kind in the country, and the University's College of Engineering is among the highest ranked Colleges of Engineering. This fact limited the number of evaluators who could be considered appropriate based upon Communication No. 9. Averback solicited letters from the other two evaluators suggested by Plaintiff. Averback gave the names to Weaver, and Weaver signed the formal letters requesting an evaluation. One of these suggested evaluators, V. Vitek, provided an evaluation which was included in Plaintiff's dossier. The other suggested evaluator, F.R.N. Nabarro, wrote back and, in his response, included a comment very critical of a paper co-authored by Plaintiff. Averback testified that, based upon this comment and also the fact that Nabarro was located outside the United States, he determined that it would not be helpful to Plaintiff to include a letter from Nabarro.

Plaintiff provided one name, in writing, of an evaluator he did not want used, A.S. Argon. No letter was solicited from Argon. Plaintiff also orally informed Averback of additional persons he wanted Averback to avoid. Averback testified that, because of problems he encountered with obtaining a sufficient number of qualified external evaluators, he eventually requested letters from Michael Mills and Patrick Veyssiere. Plaintiff had requested that Mills not be used as an evaluator because Plaintiff had provided a negative review of an article Mills submitted for publication. Although the review was anonymous, Plaintiff believed Mills had identified Plaintiff as the review's author. Mills was suggested as a potential external evaluator by sources inside and outside of the

Department, and Averback decided to contact him about providing an evaluation.  According to

Plaintiff, he also asked that Veyssiere not be used, but Averback did not recall Plaintiff giving him

Veyssiere's name.  Averback testified that, after consultation with Bellon, he decided to contact

Veyssiere about providing an evaluation.  Both Mills and Veyssiere wrote evaluation letters which

were included in Plaintiff's dossier.  Averback obtained a total of seven external evaluation letters.

While several faculty members stated that they felt the letter from Mills was somewhat weak, the

record shows that the majority of faculty members who expressed an opinion stated that the external

evaluation letters included in Plaintiff's dossier were good.

Before Weaver became Department Head in 2000, the four members of the Department's

Promotion and Tenure Committee voted on candidates for tenure and made a recommendation to

the Department Head regarding whether the candidate should be given tenure.  After Weaver

became Department Head, this procedure was changed so that the recommendation to the

Department Head was based upon the vote of all tenured faculty in the Department.  The first

candidate for tenure subject to this procedure was Pascal Bellon, who was granted tenure in 2001,

the year before Plaintiff was considered for tenure.  In Bellon's case, the faculty met in the fall of

2001 for a vote on whether the Department Head should recommend Bellon for tenure.  However,

the meeting adjourned without a vote.  After a period of time, the faculty met again for further

discussion and a vote.  Ten faculty members voted in favor of tenure, ten faculty members were

opposed to tenure, and one faculty member abstained.  On September 27, 2001, Weaver wrote to

Bellon and advised him that he intended to recommend that Bellon be issued a notice of

nonreappointment.

Bellon appealed this decision to the faculty.  During the period between the initial faculty

vote and the appeal meeting, Bellon met with the faculty members individually to explain his work. In addition, Averback and Gert Ehrlich, faculty members in Bellon's area, forwarded a memo to Weaver which was circulated to the Department, in which they criticized the external evaluators. They also asserted that there were inaccuracies presented at the meetings concerning Bellon's work. Weaver determined that it was appropriate that the Department contact additional external evaluators.  The additional materials obtained from those evaluators were made available to the faculty at the second meeting.  Additionally, Bellon's dossier was updated and made current as of the date of the appeal meeting.  This updating included some additional invitations to speak and a list of five submitted papers (not yet approved, though all were subsequently accepted).  At the appeal meeting, a discussion occurred and a vote was taken.  On this occasion, the faculty voted seventeen to four in favor of Bellon's tenure.  On November 8, 2001, Weaver forwarded Bellon's dossier to Dean Daniel with a recommendation that he be given tenure.  Following this process, Bellon was granted tenure.

In Plaintiff's case the following year, the first faculty meeting to discuss his candidacy for tenure was held on September 20, 2002.  As Chairman of the Promotion and Tenure Committee, Averback presided over the meeting.  This was the first such meeting that Averback presided over as Chairman.  Averback began the meeting by presenting the promotion standard on an overhead transparency and by discussing the necessary qualifications for tenure.  Averback then stated that Plaintiff did not meet these standards in some areas.  Weaver testified that he told the faculty that if they weren't certain about how to vote, they should vote "no."  Bellon was chosen to make a presentation of Plaintiff's case.  Weaver testified that Bellon was chosen because he was a supporter of Plaintiff, he was in the same field as Plaintiff, and had gone through the tenure process the year

before.  Bellon gave a positive presentation supportive of Plaintiff's case.  At the meeting, both Weaver and Greene made remarks critical of Plaintiff.  Weaver also made comments which downplayed the importance of teaching in a tenure decision.

On September 23, 2002, Plaintiff presented his colloquium.  In his colloquium, Plaintiff discussed the research he had done at the University and answered questions after his presentation.  Prior to the colloquium, Plaintiff met with Robertson to present a "rehearsal" of his colloquium material because Robertson was familiar with Plaintiff's work and was not going to be able to be present for Plaintiff's presentation to the faculty.  Robertson urged Plaintiff to revise the colloquium to make it have more of an impact on non-experts in Plaintiff's field.  Plaintiff also met with Bellon who suggested some changes.  Because of these revisions, Plaintiff had to replace some of his presentation slides with handwritten notes which he used during his presentation.  Weaver was critical of the use of handwritten transparencies.

After the colloquium, another faculty meeting was held on October 2, 2002.  The faculty discussed Plaintiff's qualifications for tenure and then voted on whether Plaintiff should be recommended for tenure.  Prior to the vote, Weaver discussed Plaintiff's candidacy with some members of the faculty and made negative comments.  Bellon testified that Weaver asked him how he was going to vote and suggested that Plaintiff was not the kind of person to be stuck with for 25 years and should not be promoted.  Bellon testified that he told Weaver he had a different opinion and walked away.  Bellon testified that he felt pressured by Weaver, but voted in favor of tenure for Plaintiff. James Economy, the former head of the Department, testified that Weaver approached him two to three times to make negative comments about Plaintiff and also encouraged him not to come to the meeting to vote.  However, Economy testified that Weaver was not successful in influencing

his vote.

Averback testified that, prior to this meeting, he called Mills to get additional information because he was not sure how to vote.  This conversation occurred after Mills submitted his evaluation letter.  Averback did not discuss his conversation with Mills at the meeting.

At the meeting on October 2, 2002, the faculty voted by secret ballot.  The faculty ballots were counted at the meeting and found to be thirteen against tenure and six in favor.  Shortly thereafter, Weaver asked for a vote of the Department Promotion and Tenure Committee.  That vote was four to zero against tenure.  Based upon the negative vote, Weaver wrote to Plaintiff to notify him that Weaver was going to recommend against tenure and that Plaintiff had a right to appeal.

After the Department's negative recommendation, Plaintiff asked the faculty to reconsider and prepared a written appeal document which was circulated to the faculty.  Prior to the appeal meeting of the faculty, approximately 21 letters in support of Plaintiff were received from persons outside of the University, some of them written by very well-known individuals in Plaintiff's field. Weaver, after consulting with Dean Daniel, sent everyone in the Department an e-mail suggesting that the letters were not appropriate, and that he believed they should not be considered.  This was because the letters were not solicited with the same guidelines that the University imposes on communications with external evaluators.  However, the letters were provided to all members of the faculty prior to the appeal meeting.

On October 16, 2002, Plaintiff asked a secretary of the Department for Burnett's telephone number.  According to Plaintiff, Weaver later entered Plaintiff's office and said, "Don't fuck with people outside the University!" "Don't fuck with alumni!" "You are screwing yourself!" "Five minutes ago I thought you had a good brain to pass on to your children.  I don't think so anymore!"

After Weaver left the room, Plaintiff wrote a letter to Weaver setting out these statements and protesting Weaver's behavior.  Weaver later admitted making some of the statements attributed to him by Plaintiff.

On October 28, 2002, Plaintiff spoke with Dean Daniel and complained that his unsuccessful bid for tenure was a result of Weaver's retaliatory activity.  Plaintiff alleged to Daniel that Weaver inappropriately influenced the tenured faculty of the Department in retaliation for Plaintiff not nominating Weaver for the teaching award.  Plaintiff also asked that the appeal of the negative decision be heard by a different committee.  Subsequently, Dean Daniel spoke to four members of the Department, Geil, Schweizer, Averback, and Russ Jamison.  All four faculty members told Daniel that Weaver's behavior was appropriate.  Schweizer had suggested that Daniel speak to Jamison because Jamison was a quiet individual and perhaps someone Weaver might have influenced had he attempted to do so.  Daniel also spoke to Weaver.  Weaver affirmed that he did suggest to Plaintiff that the Department Head should be eligible for teaching awards.  Weaver also admitted using profanity when he spoke to Plaintiff on October 16, but denied any inappropriate attempt to influence the faculty vote.  On October 30, 2002, Daniel e-mailed Plaintiff and advised him that Daniel did not think Weaver behaved inappropriately relative to the promotion and tenure decision.  Daniel also informed Plaintiff that "the original decision-making body is generally, if not always, the same body that considers that appeal."

The faculty met on October 30, 2002, to reconsider their recommendation.  This meeting was chaired by Weaver as Department Head.  Bellon testified that, at this meeting, he presented some of the information contained in the additional letters received by the faculty.  The faculty again voted by secret ballot.  The ballots were counted at the meeting and found to be nine votes in favor of

tenure, nine votes against, and one abstention.  Weaver wrote to Plaintiff the same day and advised him that the Department intended to affirm the original decision regarding the notice of nonreappointment.  Subsequently, Weaver received an e-mail from Veyssiere, who wrote to Weaver complaining about the denial of tenure to Plaintiff.

On November 5, 2002, Plaintiff wrote to Gerald J. Janusz, the chairman of the Faculty Advisory Committee, and asked the committee to consider his grievance over the denial of tenure. The Faculty Advisory Committee is made up of representatives elected from the entire faculty body. It is a campus-wide body that is advisory to the Provost and only investigates procedural matters. It is undisputed that the Faculty Advisory Committee is not qualified and does not attempt to determine whether a candidate is entitled to tenure.  On November 14, 2002, Janusz appointed a subcommittee to look into the matter.  The members of the subcommittee were Paul Gerding, Lynn Barnett-Morris, and Jan Novakofski.

On November 22, 2002, Plaintiff filed a grievance with the College of Engineering Grievance Committee.  In this grievance, Plaintiff stated that he would like the College Grievance Committee to investigate misconduct which occurred in the evaluation of his promotion in the Department.  Specifically, Plaintiff alleged that: (1) Averback asked for negative comments from external evaluators and biased the evaluators against him; (2) Weaver was prejudiced against him because he did not nominate Weaver "for an award he did not deserve"; (3) Weaver verbally abused him and his children; (4) Weaver inappropriately influenced the committee meetings on his promotion by misrepresenting his contributions; (5) Weaver treated proxy votes discriminatorily by accepting negative votes and discarding positive votes; and (6) the same committee was improperly used to evaluate his appeal.  Plaintiff's allegations regarding Averback were based upon statements

supposedly made by Mills to the effect that Averback sought negative comments from him.

The Grievance Committee was composed of Lance Cooper, David Lange, Phillip Krein, Eric Loth, and Joseph Torrellas.  The Grievance Committee conducted an investigation and looked into the procedures used to evaluate Plaintiff's case.  The Grievance Committee did not look at Plaintiff's dossier or consider the substance of his tenure case.  On December 27, 2002, the Grievance Committee issued its six-page report.  The report stated:

> The Grievance Committee finds that while there were certain areas in which departmental procedures, as well as the Department Head's handling, of Prof. Sun's promotion case could have been improved, it is our view that there were no procedural problems that ultimately resulted in an unfair or tainted adjudication of Prof. Sun's promotion case by the faculty of the Materials Science and Engineering Department.  Consequently, as we believe that the earlier recommendation of the department to not promote Prof. Sun accurately reflects the collective wish of the tenured MatSE faculty, and resulted from a decision-making process that was in all respects consistent with the guidelines outlined in Provost Communications 9 and 10, we do not recommend that Prof. Sun's promotion case be reviewed in a second appeal.

In its report, the Grievance Committee discussed Plaintiff's specific allegations of misconduct.  The Grievance Committee stated that it had contacted Mills by phone and "Mills denied that there had been any attempt by Prof. Averback or any other member of the MatSE department at UIUC to

13

solicit from him negative comments about Prof. Sun." The Grievance Committee therefore concluded that the evidence did not support the allegation that negative referee comments were solicited by Averback or any other faculty member. The Grievance Committee also concluded that Averback's "reasons for not honoring all of Prof. Sun's <u>secondary</u> list of requested exclusions were reasonable and in accordance with Provost Communication 9" (emphasis in original). The Grievance Committee stated that in "addition to finding no evidence that the use of Prof. Mills as an external evaluator was procedurally improper, the Grievance Committee found no indication that Prof. Sun's case was in any way disadvantaged by Mills' letter."

The Grievance Committee also stated that "while there is a perception on the part of some MatSE faculty members that Prof. Weaver was too forceful in his attempts to sway faculty voting, particularly given his role as head of the department, there is no evidence that Prof. Weaver's actions were the reason that the voting faculty of MatSE ultimately did not support the promotion of Prof. Sun in either the original or appeals votes on his case." The Grievance Committee also found no evidence that the use of the same committee to evaluate his appeal resulted in a biased review of his case. The Grievance Committee noted that this procedure is in accordance with Provost Communication 10. The Grievance Committee also concluded that the evidence showed that all absentee ballots were counted. The Grievance Committee finally discussed Plaintiff's allegations of verbal abuse by Weaver. The Grievance Committee stated, "there is evidence in this case that aspects of the 'Professionalism in the Work Place' memorandum distributed by the Dean on 9/18/02 were violated, particularly with respect to the use of disrespectful language and the display of unprofessional conduct." However, the Grievance Committee concluded that these allegations, while considered seriously, were unrelated to Plaintiff's allegations of inappropriate procedures

14

during his promotion process, since there was no evidence that the incidents described by Plaintiff resulted in an improper handling of Plaintiff's promotion case. The Grievance Committee noted that Weaver admitted to speaking to Plaintiff in a raised voice and to uttering a profanity during his October 16, 2002, exchange with Plaintiff. The Grievance Committee stated:

> [W]hile Prof. Weaver expressed to the Committee regret for his October 16 comments, it is clear that, coming from the Department Head in the midst of the promotion process, these comments eroded the confidence that Prof. Sun had in the integrity of his promotion process, and greatly undermined his trust in Prof. Weaver. Moreover, such comments are contrary to the guidelines put forward by the College and Campus regarding the manner in which faculty should interact with one another, and should be discouraged.

After Dean Daniel received the Grievance Committee's report, he reviewed with Weaver his expectations for professional conduct in the College of Engineering. On January 22, 2003, Weaver resigned as Department Head. Weaver remained a tenured member of the faculty and was subsequently appointed to the Donald B. Willett Professorship of Engineering.

On January 24, 2003, Dean Daniel wrote to Plaintiff. Daniel stated that, based upon the Grievance Committee's conclusion that Plaintiff's promotion case was handled fairly, he affirmed his previous request to Provost Herman that Plaintiff be issued a notice of nonreappointment. Daniel also informed Plaintiff that he had reviewed with Weaver his expectations for professional conduct. Daniel noted that Plaintiff had already filed a grievance with the Faculty Advisory Committee, which was his next avenue of appeal.

15

The subcommittee of the Faculty Advisory Committee assigned to Plaintiff's case deferred its consideration of Plaintiff's appeal until the completion of the investigation by the College Grievance Committee and interviewed witnesses between March and May 2003. Weaver declined to be interviewed by the Faculty Advisory Committee.

On March 20, 2003, Robertson became Interim Head of the Department. In April 2003, Robertson met with Plaintiff and suggested that Plaintiff resign from the selection committee for the Burnett Teacher of the Year Award. Plaintiff testified that Robertson said he should resign because he had taken actions against the Department by filing complaints and had attacked the Department. Plaintiff refused to resign, stating that he believed that he could be fair in his considerations, and pointed out that there were four members of the committee so that his vote would not be determinative in any event. Robertson then agreed with Plaintiff and did not remove him from the committee. Plaintiff participated in choosing the winner of the teaching award in 2003.

On May 15, 2003, the Faculty Advisory Committee issued its six-page report to Provost Herman. The Faculty Advisory Committee stated that "[a]fter considering all of the information available to us, we unanimously reached the conclusion that Professor Sun's promotion and tenure dossier was **not** fairly considered" (emphasis in original). In reaching this conclusion, the Faculty Advisory Committee concluded that the "Department Head inappropriately tried to negatively influence the promotion and tenure vote on Professor Sun's dossier." However, the Committee further stated that "proof that he actually influenced a faculty member into changing his/her positive vote to a negative one is absent." Nevertheless, the Committee concluded that there was "convincing evidence to conclude that Professor Sun's dossier did not get a fair hearing." The Committee also concluded that absentee ballots were not treated consistently at different votes on

Plaintiff's tenure and that "different and more exacting procedures and standards were applied" to Plaintiff's case in comparison with Bellon's case the year before. The Committee also concluded that Plaintiff's appeal was not fairly considered because the appeals meeting was chaired by the Department Head, Weaver, and because the appeal was considered by the original voting body, all of the tenured faculty in the Department. The Committee noted that this complied with "the letter of the law" in the Provost's communication, but that the Faculty Advisory Committee had been recommending "for years" that appeals be considered by a separate body. Based upon these conclusions, the Faculty Advisory Committee recommended to Provost Herman that "a more fair and impartial evaluation of Professor Sun's promotion and tenure dossier be undertaken."

However, the Faculty Advisory Committee also found that evidence that members of the Materials Research Laboratory voted as a block and were influenced by Greene and Averback was "purely speculative." The Faculty Advisory Committee also rejected the allegation that Averback tried to negatively influence the outcome of Plaintiff's promotion and tenure case. The Committee concluded that Averback was "entitled to make negative evaluative comments about a candidate since he is a member of the faculty." The Committee noted that Averback's comments were made at an open faculty meeting and "thus there is no violation." In addition, the Faculty Advisory Committee did not agree with Plaintiff's allegation that Averback deliberately solicited letters from external evaluators who Plaintiff had previously indicated should be excluded. The Committee stated that the "solicitation of an 'excluded' individual as an evaluator is consistent with Communication No. 9 which says that individuals cannot be excluded." The Committee further stated that Averback "provided a compelling rationale that Professor Sun's field of expertise is quite small, and given additional stipulations that reviewers have to be of peer institutions and also that

17

several other reviewers wrote that this individual should be contacted, it was not unreasonable that

he be contacted." The Committee also agreed with Averback that Plaintiff's reason for excluding

this individual was "weak in comparison with the reasons for including him." The Faculty Advisory

Committee further stated that Mills flatly denied that he had been contacted by anyone soliciting

negative comments so that there was "no evidence to pursue this allegation any further."

After receiving the report of the Faculty Advisory Committee, Provost Herman decided that

Plaintiff's case should be reconsidered. Provost Herman, Dean Daniel and Robertson agreed that,

because the faculty governance structure dictated that the faculty themselves decide promotion and

tenure, the faculty should determine whether they could render a fair and impartial decision. If the

faculty believed that they could, they should vote. If they determined they could not, an external

committee would decide the matter.

On July 8, 2003, a meeting was held and the faculty reconsidered Plaintiff for tenure. Prior

to this meeting, Robertson received information from Plaintiff regarding his professional activities

since October 2002. Robertson stated in his affidavit that he considered this additional information

to be marginal at best, possibly because of the strain Plaintiff was under due to the appeal of the

tenure decision, so his opinion was that not adding this material to Plaintiff's dossier would benefit

Plaintiff. According to Plaintiff, he had a significant number of publications and accomplishments

during this time which should have been added to his dossier. However, it is undisputed that all

questions about Plaintiff's activities since the previous fall were answered during the discussion

leading up to the vote.

At the meeting, Robertson told the faculty that the Faculty Advisory Committee had

determined that certain activities of Weaver were improper and may have tainted the decision. He

also stated that it was determined by the Faculty Advisory Committee that there was no improper conduct regarding the outside evaluators. Weaver did not attend the meeting.

Following Robertson's explanation, Robertson asked the faculty to vote on a confidentiality policy under which faculty who distributed information about meetings would be excused from such meetings for one year. This policy was adopted. Robertson then polled the faculty members on the issue of whether they could fairly consider Plaintiff's application for tenure. He advised the faculty that unless a two-thirds majority believed that they could be fair, he would turn the matter over to an external committee. The faculty members voted 13 to 4 that they could render a fair and impartial decision. A new faculty member abstained from this vote.

After this vote, Bellon made a presentation and a discussion followed. The faculty then voted. The vote was eight in favor of tenure, ten against tenure and one abstention. This vote included four absentee votes. Robertson testified that he did not vote. Weaver provided a proxy vote, but Robertson did not count his vote. Robertson then asked the faculty to vote on whether they believed the matter should be referred to an outside committee. The vote was five in favor, six against and two abstentions. Following this vote, Robertson determined not to sent the matter to an external committee.

On July 10, 2003, Robertson wrote a letter to Daniel which he forwarded with Plaintiff's dossier. In the letter, Robertson described what happened at the faculty meeting and included a paragraph which stated:

> While it is clear that Yong-Qian Sun is an excellent teacher
> and has in the past, as indicated in the letters of reference, produced
> high-quality work, he has not been able to establish and sustain a

19

high-quality research program at the University of Illinois.  The usual indicators of high-quality work (number of invited presentations at international and national meetings, invitations to join conference organizing committees, research funding etc.) are missing.  Through the Department he has submitted 24 proposals since joining in 1998.  He has also been a member of other multi-investigator proposals submitted through other institutions.  Of these, he has received an [National Science Foundation (NSF)] Career award (1999), supplementary funds to the Career award from the US Department of Defense (airforce) plus matching funds from NSF, funds from the US Department of Defense (airforce), and funds through the NSF STC on Water Purification at Illinois.  The total level of funding over a six-year period is $462,501, which comes to less than $80,000 per year.  To put this in perspective, the average annual funding level per faculty in Materials Science and Engineering is in excess of $250,000.  An important point is that Sun is primarily an experimentalist and this generally requires a high level of continuous funding to support a viable program.  While total funding should not be and was not an issue, Sun continues to resubmit proposals on similar topics, he does not appear to have learned from his failure, and he has not changed his approach to seeking funds from external agencies.  These are strong indicators that Sun is unlikely to

20

"improve his or her contributions to the unit over the long period

typically involved in a tenured appointment" and the unit would be

"better able to improve itself by hiring anew."  Based on the above,

I recommend against the promotion of Yong-Qian Sun to the rank of

Associate Professor with tenure.

On July 11, 2003, Dean Daniel forwarded Plaintiff's dossier to the College Promotion and Tenure Committee for review.  Robertson's paragraph regarding his recommendation was included as part of the dossier.  The College Promotion and Tenure Committee consisted of six members, one of whom was Weaver.  Weaver and another member of the committee were not involved in the review of Plaintiff's dossier.  The four remaining members were Lance Cooper and Phillip Krein, who were members of the Grievance Committee which considered Plaintiff's case, as well as Larry Bergman and Bruce Hajek.  On July 16, 2003, Plaintiff complained to Dean Daniel that Cooper and Krein, who had been on the College Grievance Committee, were also on the College Promotion and Tenure Committee.  Daniel testified that he wanted to see the College Promotion and Tenure Committee's report because it was the only appointed entity to evaluate promotion cases and it was nearly finished with its evaluation.

On July 17, 2003, the College Promotion and Tenure Committee sent its seven-page report to Dean Daniel.  The report stated that, following the Committee's review, it concluded that the decision by the Department "to not promote Prof. Sun was 'reasonable' in the sense that it was consistent with not only the current standards and past practices established by the MatSE department, but also with the guidelines and procedures established by the Provost for promotion and tenure cases."  The report then detailed the conclusions it reached following its review of

Plaintiff's record and its comparison of Plaintiff's case to Bellon's case.  The Committee stated that the "negative departmental votes in the Bellon case indicate to us that the Bellon case was near the borderline of what is acceptable to the MatSE faculty for promotion to associate professor with tenure" and thus "offers an important point of reference for the Sun case."   The Committee concluded that: (1) there was no substantive difference in the formatting of the two dossiers; (2) the credentials of the external evaluators for Plaintiff and for Bellon were roughly comparable, although the overall credentials of Bellon's letter writers were perhaps slightly stronger than those writing for Plaintiff's case; (3) the two cases were nearly equivalent as to classroom teaching; (4) although both cases were somewhat below average in graduate student supervision, Bellon's case was slightly stronger because he had supervised one Ph.D. student to completion and had published a larger number of journal articles with his students; (5) the quantity and quality for journal publications was roughly similar; (6) Bellon had a better record as to invited presentations, particularly those that were international in scope; (7) Bellon had a significantly better record of research funding; (8) the strength of the external evaluation letters was similar for both Plaintiff and Bellon, so the two cases were rated evenly on this point; and (9) the level of service in the two cases was comparable and satisfactory.   The Committee concluded that the cases of Bellon and Plaintiff were very similar in many categories but that Bellon's case was stronger in the areas of visibility, number of students graduated, impact of recent work, and record of research funding.  The Committee stated that there were no areas where Plaintiff's case was superior to Bellon's.  The Committee also concluded that the process by which the faculty arrived at their decision was reasonable.

Cooper testified that, when he looked at the case as a member of the College Promotion and Tenure Committee, he had "utter confidence" in his ability to be reasonable and not let prior

decisions influence him. He also testified that his experience with the Grievance Committee did not affect his consideration of the issues as a member of the College Promotion and Tenure Committee and stated that the Grievance Committee did not even look at the dossier.

After he received the report of the College Promotion and Tenure Committee, Dean Daniel conducted his own review of Plaintiff's dossier. On July 21, 2003, Daniel sent a letter to Provost Herman which set out the procedures followed to review Plaintiff's case following the report of the Faculty Advisory Committee. Daniel then informed Herman that he conducted his own re-assessment of the case and stated that, in his judgment, "this case does not meet the expectations for promotion and tenure in the College of Engineering." Daniel stated that his own recommendation was against promotion and tenure. On July 21, 2003, Herman wrote to Plaintiff and stated that he was recommending that a letter of nonreappointment be issued.

On July 28, 2003, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging discrimination based on race and national origin. Daniel and Herman were informed of the EEOC charge. On September 25, 2003, the EEOC issued its right to sue letter.

In August 2003, Janusz, the Chairman of the Faculty Advisory Committee, informed Provost Herman that two members of the College Promotion and Tenure Committee had also been members of the Grievance Committee which considered Plaintiff's appeal. Herman testified that, to err on the side of caution, he agreed to appoint an ad hoc committee at the University level. The ad hoc committee chosen by Herman was comprised of Harry Cook, Andrew Gewirth, Gene Robinson, and Charles Tucker, all of whom were senior scholars at the University. Plaintiff found the proposed group acceptable. In fact, Cook had been suggested by Plaintiff. On October 14, 2003, Herman sent

23

a letter to each of the members of the ad hoc committee.  Herman enclosed a copy of Plaintiff's

dossier which included Robertson's comments regarding the Department's decision to recommend

against tenure.[2]  Herman also enclosed additional material Plaintiff provided updating his dossier.

Herman stated that he was seeking advice concerning the substance of Plaintiff's case and asked the

ad hoc committee to determine "Is the department's unfavorable recommendation justified on the

merits of the case, or does the case warrant being advanced with a favorable recommendation to

higher levels of review?"  Herman testified that he did not provide the ad hoc committee with the

additional letters received following the initial Department vote recommending denial of tenure

because these letters were not gathered as part of the formal procedure.

Charles Tucker stated in his affidavit that he is a Professor in the Department of Mechanical

Industrial Engineering and is currently the Associate Head for the undergraduate program in the

Department.  He stated that, on October 14, 2003, he was asked by Herman to participate in the ad

hoc committee to provide advice regarding Plaintiff's promotion case.  Tucker stated that, as a

member of the Campus Promotion and Tenure Committee for three years, he had the opportunity

to review hundreds of dossiers and materials provided with respect to candidates for tenure.  He

stated that Herman provided him with Plaintiff's dossier, along with additional materials provided

by Plaintiff updating the dossier.  The ad hoc committee was advised by Herman that it had been

determined that there were flaws in the process by which the initial decision on the tenure question

was made.  The ad hoc committee was not advised of the nature of the flaws but were just told that,

due to certain perceived procedural flaws, they were being asked to review the dossier as a special

---

[2]  Barnett-Morris, a member of the Faculty Advisory Committee who investigated
Plaintiff's case, testified that Herman had agreed not to provide Robertson's comments to the ad
hoc committee.  Herman testified that there was no such agreement.

ad hoc committee advising Herman.  Herman did not inform the ad hoc committee of the results of the votes taken by the Department or of the results of the review by the College Promotion and Tenure Committee.

Tucker stated that the dossier they received included the comments of Robertson, the Head of the Department.  Tucker stated that these comments were read and considered but were one of several factors, and not the most important factor, in his evaluation of the dossier.  Tucker stated that the discussions of the ad hoc committee "centered around the quality of the work of Professor Sun as reflected in his dossier with updates, and the traditional factors of service, teaching and research which are the bases for making determinations about tenure."  Tucker stated that it was his opinion, based upon his evaluation of the dossier and the other materials provided by Plaintiff, that Plaintiff "was not deserving of tenure in the Materials Science and Engineering Department, one of the top two or three departments in the United States."  Tucker stated that this "was the consensus of the committee."   Tucker further stated that his decision "was based upon the standards of the Department and the qualifications of Professor Sun as set forth in his dossier as updated, and no other reason."  The vote of the ad hoc committee was three to one against granting Plaintiff tenure.

On November 7, 2003, Herman wrote a letter to Plaintiff affirming the negative recommendation and recommending nonreappointment.  On November 19, 2003, Plaintiff appealed to Chancellor Nancy Cantor, complaining of procedural irregularities.  The Faculty Advisory Committee also wrote to Chancellor Cantor and Herman to record their continuing concerns with the procedures followed.  On November 24, 2003, Herman wrote Chancellor Cantor a four-page letter regarding the "long history" of Plaintiff's case.  In his letter, Herman disagreed with Plaintiff's claims and defended his decision.  In December 2003, Herman was advised by Plaintiff that his list

25

of 21 conference proceedings was not included in the dossier that was provided to the ad hoc committee.  In his affidavit, Herman stated that it was his belief that conference proceedings were not a significant part of Plaintiff's dossier and the presence or absence of the conference proceedings did not change the evaluation of the dossier.  Weaver, Daniel, Cooper, Robertson, Averback and Greene all testified that conference proceedings were not a significant part of the dossier.  In addition, Jian Ku Shang, Trudy Kriven and James Economy, faculty members who were very supportive of Plaintiff's tenure and told the Faculty Advisory Committee that Plaintiff was unfairly denied tenure, all testified that conference proceedings were not an important part of the dossier.[3] It is undisputed that there was no discussion of the conference proceedings portion of Plaintiff's dossier, or the lack thereof, at any of the faculty meetings where Plaintiff's tenure was discussed.


On December 8, 2003, Chancellor Cantor wrote to Plaintiff advising him that she had carefully considered the concerns he raised regarding the handling of his case for promotion and tenure.  She stated that she found no grounds to reverse the decision previously made concerning tenure.

On January 12, 2004, Plaintiff filed his Amended Complaint (#4) in this case against Defendants.  Plaintiff alleged employment discrimination in violation of Title VII of the Civil Rights Act of 1964 and also claimed violations of his rights under 42 U.S.C. § 1981 and 42 U.S.C. § 1983.

ANALYSIS

MOTIONS FOR SUMMARY JUDGMENT

I.  SUMMARY JUDGMENT STANDARD

---

[3] Shang is Chinese and was granted tenure in the Department in 1995.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Schad v. Jones, 415 F.3d 671, 673 (7th Cir. 2005). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970); see also Carreon v. Ill. Dept. of Human Servs., 395 F.3d 786, 790 (7th Cir. 2005). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion, instead the nonmoving party must present definite, competent evidence to rebut the summary judgment motion. See Vukadinovich v. Bd. of Sch. Trs., 278 F.3d 693, 699 (7th Cir. 2002).

## II.  DISCRIMINATION

In Count I of his Amended Complaint (#4), Plaintiff has alleged that the Board of Trustees, Greene, Averback, Daniel, and Herman discriminated against him on the basis of his race and

national origin, in violation of Title VII of the Civil Rights Act of 1964.[4]  Specifically, Plaintiff

alleged that he was denied promotion and tenure, and his employment was therefore terminated, on

the basis of his race and national origin.

Defendants argue that they are entitled to summary judgment on Plaintiff's discrimination

claim because Plaintiff has not presented any direct evidence of discrimination and cannot prevail

under the indirect method set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03

(1973).[5]

In his Response, Plaintiff first argues that, based upon this record, there is circumstantial

evidence of discrimination sufficient to raise a genuine issue of material fact under the direct method

of proof.  Plaintiff relies upon the voting record of the Department Promotion and Tenure Committee

and the statement made by Greene regarding Chinese students.  This court agrees with Defendants

that this evidence cannot be considered circumstantial evidence of discrimination in this case.

The method of proving discrimination by putting forth evidence of discriminatory motivation

often is called the "direct" method.  Rudin v. Lincoln Land Comty. Coll., 420 F.3d 712, 720 (7th Cir.

2005).  In order to establish his prima facie case under the direct method, Plaintiff must prove that

Defendants were motivated by animus based upon his race and national origin when he was denied

---

[4]  This court notes that both Plaintiff and Defendants have referred to Title VII claims against the individual Defendants.  Only an employer may be liable under Title VII.  See Jackson v. Int'l Bhd. of Teamsters, 2002 WL 31572544, at *7 (N.D. Ill 2002).  However, Plaintiff has also alleged discrimination claims against the individual defendants under 42 U.S.C.§ 1981 and 42 U.S.C. § 1983.  The standard to be applied is the same.  See Blise v. Antaramian, 409 F.3d 861, 866 n.4 (7th Cir. 2005); Williams v. Seniff, 342 F.3d 774, 788 n.13 (7th Cir. 2003); Walker v. Abbott Labs., 340 F.3d 471, 474 (7th Cir. 2003).

[5]  Defendants also argued that they are entitled to summary judgment on Plaintiff's Title VII retaliation claim, but Plaintiff stated that he is not pursuing such a claim.

promotion and tenure.  See Mosley v. Maytag Corp., 2006 WL 213950, at *4 (C.D. Ill. 2006).  A plaintiff proceeding according to the direct method may rely on two types of evidence: direct evidence or circumstantial evidence.  Rudin, 420 F.3d at 720.

In this case, Plaintiff does not claim to have direct evidence of discrimination.  However, as noted, Plaintiff does contend that he has circumstantial evidence.  Circumstantial evidence of discrimination is evidence which allows the trier of fact to infer intentional discrimination by the decisionmaker.  Rudin, 420 F.3d at 720.  The Seventh Circuit has recognized three kinds of "circumstantial" evidence of intentional discrimination : (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.  Rudin, 420 F.3d at 720-21.  A plaintiff can avoid summary judgment based upon such circumstantial evidence by "creat[ing] a triable issue of whether the adverse employment action of which [he] complains had a discriminatory motivation."  Rudin, 420 F.3d at 721, quoting Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1397 (7th Cir. 1997).   "All that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had [terminated] the plaintiff because the latter was a member of a protected class."  Troupe v. May Dept. Stores Co., 20 F.3d 734, 737 (7th Cir. 1994).  Nevertheless, even circumstantial evidence must point directly to a discriminatory reason for the employer's action.  Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003); Brewer v. Bd. of Trs. of the Univ. of Ill., 407 F. Supp. 2d 946, 964 (C.D. Ill. 2005).

Plaintiff's argument regarding the voting record of the Department Promotion and Tenure Committee is imaginative, but unsupported by any case law and ultimately unpersuasive. Plaintiff notes that, between the years of 1993 to 2003, the four members of the Department's Promotion and Tenure Committee voted on 19 promotion candidates, two of whom were Asian and from the People's Republic of China (Shang and Plaintiff) and 17 of whom were Caucasian. According to Plaintiff, the Department Promotion and Tenure Committee voted unanimously against Shang and Plaintiff and, in almost every case, voted unanimously in favor of the Caucasian candidates. The problem with Plaintiff's argument is that Shang <u>was</u> given tenure and promoted by the Department and the vote against Plaintiff by the Department Promotion and Tenure Committee had no effect because, after Weaver became Department Head in 2000, it was the vote of the full tenured faculty which counted. This court therefore concludes that this evidence cannot be considered "statistical" evidence that similarly situated employees outside the protected class received systematically better treatment. <u>See</u> <u>Rudin</u>, 420 F.3d at 721; <u>Mosley</u>, 2006 WL 213950, at *5-6.

Plaintiff also argues that Greene's remark about Chinese students constitutes circumstantial evidence of discrimination. Plaintiff concedes that Greene's remark is not direct evidence of discrimination against Plaintiff because Greene referred to "students" and not "Professors." However, Plaintiff contends that Greene's remark is circumstantial evidence in this case because it shows that Greene held prejudicial views about the Chinese. Plaintiff further argues that this remark was contemporaneous with and temporally related to the adverse employment action because the remark occurred at the time the Department Promotion and Tenure Committee, of which Greene was a member, was discussing Plaintiff's case and was working on the selection of external evaluators for Plaintiff's dossier. Plaintiff contends that Greene used his influence as a member of the

Department Promotion and Tenure Committee, and especially as the Director of MRL, to influence other faculty members to vote against Plaintiff.  Plaintiff contends that Greene told the faculty members that Plaintiff was not worthy of promotion and misrepresented Plaintiff's records in publications and grant applications.

Defendants contend, however, that Greene's remark about Chinese students was a "stray workplace remark" that is not evidence of discrimination.  Defendants also argue that the evidence does not show that Greene misrepresented Plaintiff's credentials but rather shows that Greene only expressed his opinion about Plaintiff's scholarship.

"Stray remarks that are not 'proximate and related to the employment decision' are insufficient to defeat summary judgment." Lerner v. Ravenswood Hosp. Med. Ctr., 1999 WL 1267710, at *5 (N.D. Ill. 1999), quoting Bahl v. Royal Indem. Co., 115 F.3d 1283, 1293 (7th Cir. 1997).  However, the statements of one who lacks the final decision-making authority may be probative of intentional discrimination if that individual exercised a significant degree of influence over the contested decision.  Lerner, 1999 WL 1267710, at *5; Porter v. State of Ill., Dep't of Children & Family Servs. , 987 F. Supp. 667, 673 (N.D. Ill. 1997), aff'd, 165 F.3d 32 (7th Cir. 1998).

In this case, Greene did not make the decision to deny tenure to Plaintiff.  Instead, he had just one vote when the tenured faculty of the Department voted on Plaintiff's tenure.  Where an individual defendant casts only one of many votes, the defendant's actions are "too attenuated from the adverse actions befalling Plaintiff to constitute probative evidence of intentional discrimination." Lerner, 1999 WL 1267710, at *5 (N.D. Ill. 1999), citing McCarthy v. Kemper Life Ins. Cos., 924 F.2d 683, 686 (7th Cir. 1991) ("statements by non-decision makers or statements by decision makers unrelated to the decisional process itself" do not suffice to satisfy the plaintiff's burden).

31

Based upon the applicable case law, this court concludes that accepting Plaintiff's argument that intentional discrimination can be inferred from Greene's statement would require multiple layers of speculation. The trier of fact would have to infer from Greene's one-time remark that he harbored a bias against Plaintiff because Plaintiff is  Chinese and that, based upon this discriminatory animus, Greene attempted to influence other faculty members to vote against Plaintiff. Further, the trier of fact would have to infer that other faculty members were so influenced and this influence somehow carried on through the numerous reviews of Plaintiff's case and dossier which occurred at various levels at the University. This court concludes that the trier of fact simply could not reasonably make such inferences. This court agrees with Defendants that Plaintiff has presented absolutely no evidence that anyone was influenced by Greene or his alleged discriminatory animus. See McMiller v. Bd. of Trs. of Univ. of Ill., 275 F. Supp. 2d 974, 980 (N.D. Ill. 2005).

Moreover, this court agrees with Defendants that the final decision in this case was made by Herman, after multiple layers of review, including the review by the ad hoc committee.[6] There is absolutely no evidence that Greene had any influence over Herman's decision. According to Tucker's affidavit, which Plaintiff has not attempted to contradict, the discussions of the ad hoc committee "centered around the quality of the work of Professor Sun as reflected in his dossier with updates, and the traditional factors of service, teaching and research which are the bases for making determinations about tenure." Tucker also stated that it was his opinion, based upon his evaluation of the dossier and the other materials provided by Plaintiff, that Plaintiff "was not deserving of

---

[6] Although the recommendation of the Provost regarding tenure is a recommendation which must be ratified by the Chancellor and the Board of Trustees, it is undisputed that, as a practical matter, the review by the Provost's office is the last real review of the tenure decision.

32

tenure in the Materials Science and Engineering Department, one of the top two or three departments in the United States." Tucker stated that this "was the consensus of the committee." Plaintiff's only attack on the review of the ad hoc committee is that the committee was provided with Robertson's reasons for the Department's decision which, according to Plaintiff, means that it was not an "independent" review. This court does not agree. Obviously, the ad hoc committee had to review something. If the reasons Robertson gave were inadequate, or not based upon the facts set out in the dossier, the ad hoc committee, whose members were senior scholars agreed upon by Plaintiff, was uniquely qualified to recognize those problems. Tucker stated that he had previously had the opportunity to review hundreds of dossiers and materials provided with respect to candidates for tenure. Based upon its review, the ad hoc committee made its own determination that Plaintiff did not qualify for tenure.

The Seventh Circuit has stated:

> [I]t is clear that, when the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissive basis, the bias of the subordinate is not relevant.

Willis v. Marion County Auditor's Office, 118 F.3d 542, 547 (7th Cir. 1997). This court concludes that this reasoning applies here and means that any bias on the part of Greene is irrelevant in this case. This case is not similar to the situation in the case relied upon by Plaintiff, Russell v. Bd. of

Trs. of the Univ. of Ill., 243 F.3d 336 (7th Cir. 2001).[7]  In Russell, the Seventh Circuit concluded that

the improper motives of the plaintiff's supervisor "had to be imputed to the other members of the

disciplinary committee because of [the supervisor's] extensive role in initiating and carrying out the

disciplinary process." Russell, 243 F.3d at 342.  That is clearly not the situation here.  Based on this

record, Greene did not have an "extensive role" in making the tenure decision and, therefore, there

is no basis for imputing any improper motives he had to the actual decisionmaker.  Greene cannot

be considered a decisionmaker under the facts of this case, so his remarks do not constitute

circumstantial evidence of discriminatory motivation.  See Crabtree v. Nat'l Steel Corp., 261 F.3d

715, 723 (7th Cir. 2001); see also Mlynczak v. Bodman, 442 F.3d 1050, 2006 WL 851644, at *5 (7th

Cir. 2006); Mosley, 2006 WL 213950, at *4.  Therefore, this court concludes that Plaintiff cannot

defeat summary judgment on his discrimination claims under the direct method of proof.

Plaintiff also argues that he has sufficient evidence to avoid summary judgment under the

McDonnell Douglas indirect method.  Under this method, Plaintiff must first demonstrate a prima

facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was

qualified for tenure; (3) he was denied tenure; and (4) a similarly situated applicant not in the

protected class was granted tenure.  See Namenwirth v. Bd. of Regents, 769 F.2d 1235, 1240 (7th

Cir. 1985); Sinha v. Bd. of Trs. of the Univ. of Ill., 2001 WL 921718, at *14 (N.D. Ill. 2001).  If

Plaintiff is able to establish a prima facie case, the burden of production shifts to Defendants to

---

[7]  This court notes that Plaintiff has also relied upon a decision of the Third Circuit Court
of Appeals, Roebuck v. Drexel Univ., 852 F.2d 715, 727 (3d Cir. 1988) and the Ninth Circuit
Court of Appeals, Lam v. Univ. of Haw., 164 F.3d 1186, 1188 (9th Cir. 1999).  This court
concludes that the underlying reasoning of these cases is inconsistent with Seventh Circuit case
law on the subject of tenure.  Accordingly, this court does not find the reasoning of either case
applicable or persuasive.

2:03-cv-02221-MPM-DGB   # 140   Page 35 of 47

articulate a nondiscriminatory reason for denying Plaintiff tenure. Sinha, 2001 WL 921718, at *14.

If Defendants produce a nondiscriminatory reason for the decision, Plaintiff must then prove that

the Defendants' stated reason is merely a pretext for discrimination based upon race and national

origin. See Sinha, 2001 WL 921718, at *14. In order to carry his burden, Plaintiff must provide

evidence that Defendants' explanation for the denial of tenure has no basis in fact, was not the real

reason, or was insufficient to motivate the action. Sinha, 2001 WL 921718, at *14, citing Hoffman-

Dombrowski v. Arlington Int'l Racecourse, Inc., 254 F.3d 644, 652 (7th Cir. 2001). This is an

extremely difficult burden to carry "[d]ue to the layered and subjective nature of the tenure process,

and the courts' recognition that such decisions are based on the fine 'distinction between competent

and superior achievement.'" Sinha, 2001 WL 921718, at *14, quoting Kuhn v. Ball State Univ., 78

F.3d 330, 331 (7th Cir. 1996).

In this case, even assuming Plaintiff could establish a prima facie case of discrimination,[8]

this court concludes that Defendants have articulated a nondiscriminatory reason for denying

Plaintiff tenure and that Plaintiff has not shown that Defendants' explanation is a pretext for

discrimination. Defendants have stated that Plaintiff was denied tenure because his dossier was

simply inadequate so that multiple groups and individuals determined that he did not deserve tenure.

In this case, as the court in Sinha recognized is often the case in tenure cases, the reasons can be

distilled to one, Defendants "did not find Plaintiff to be, on the whole, exceptional enough to warrant

the coveted position of Associate Professor with tenure." Sinha, 2001 WL 921718, at *14 n.12. The

---

[8] Defendants have argued that Plaintiff cannot establish a prima facie case of
discrimination because he did not show that he was qualified for tenure or that Bellon is
similarly situated in all respects. This court concludes that it is not necessary to make a
determination on these issues.

Seventh Circuit has stated that "[t]enure requires something more [than mere qualification]; it requires that the department believe that the candidate have a certain amount of promise." Namenwirth, 769 F.2d at 1242.  The Seventh Circuit further stated:

> It is not our role, as federal courts have acknowledged, to consider merely the hard evidence of research output and hours spent on committee work, and reach tenure determinations de novo.  A crucial part of the evidence we rely on is the esteem by which the candidate is held by the very persons making the tenure decision.

Namenwirth, 769 F.2d at 1242.  Therefore, courts "must not second-guess the expert decisions of faculty committees in the absence of evidence that those decisions mask actual but unarticulated reasons for the University's action."  Vanasco v. Nat'l-Louis Univ., 137 F.3d 962, 968 (7th Cir. 1998).  "[T]hat seems to mean that in a case of this sort, where it is a matter of comparing qualification against qualification, the plaintiff is bound to lose."  Sinha, 2001 WL 921718, at *17. "Tenure decisions have always relied primarily on judgments about academic potential, and there is no algorithm for producing those judgments."  Lopez v. Bd. of Trs. of the Univ. of Ill. at Chicago, 344 F. Supp. 2d 611, 621 (N.D. Ill. 2004).  It is well established that the court does not tell employers what the requirements for a job must be.  McMiller, 275 F. Supp. 2d at 981.

Plaintiff first argues that Defendants' statement that Plaintiff lacked the required academic qualifications for tenure is pretextual because it is "conclusory and circular."  Plaintiff contends that the reason given is conclusory because Defendants "failed to identify a single performance area in Plaintiff's dossier, such as Plaintiff's publication record, teaching performance, public service record, or external evaluations, that Defendant[s] found lacking" and is circular because it is

36

substantially the same as the conclusion.  Plaintiff also contends that the stated reason is pretextual because his qualifications were clearly superior to Bellon's qualifications.  This court does not agree with either argument.  The record shows that detailed reasons were given for the decisions to recommend against tenure, so they cannot be considered "conclusory."  In addition, the College Promotion and Tenure Committee provided a detailed comparison of Bellon's dossier and Plaintiff's dossier, a comparison this court is not qualified to second guess.  See Vanasco, 137 F.3d at 968; Namenwirth, 769 F.2d at 1242; Sinha, 2001 WL 921718, at *17.

Plaintiff has also relied on all of the procedural infirmities that he believes tainted the tenure decision in this case, arguing that Defendants have failed to show that the various administrators and committees who reviewed Plaintiff's case and dossier evaluated Plaintiff fully and independently. This court must conclude, however, that while Plaintiff may not have agreed with the procedures used for reviewing his case, he has not shown that the decisions reached were not honest judgments made based upon his dossier.  See Vanasco, 137 F.3d at 967-78.  In sum, this court concludes: (1) there is no evidence that Averback made any attempts to obtain unfavorable external evaluations for Plaintiff or did anything other than follow Communication No. 9, to the best of his ability, in obtaining external evaluations for Plaintiff, evaluations which were considered good by the majority of individuals who have expressed an opinion; (2) there is no evidence that the Department improperly refused to include the unsolicited letters as part of Plaintiff's dossier as the record shows that these letters were not obtained in compliance with the procedures set out in Communication No. 9; (3) there is no evidence that the omission of conference proceedings from Plaintiff's dossier had any  effect on the decision regarding tenure as it is the consensus of opinion that conference proceedings are not a significant part of the dossier (see also Sinha, 2001 WL 921 718, at *3

2:03-cv-02221-MPM-DGB   # 140   Page 38 of 47

("conference presentations . . . are not counted in any performance/tenure/promotion evaluation"));
(4) there is no evidence that the College Promotion and Tenure Committee did not fairly evaluate
Plaintiff's dossier and fairly compare Bellon's dossier with Plaintiff's even though two members of
the committee previously served on the Grievance Committee and, in fact, Cooper's deposition
testimony that he did not let prior decisions influence him is the only evidence in the record on this
point; and (5) as previously discussed, based upon Tucker's uncontradicted affidavit, there is no
evidence that the ad hoc committee did not fairly and independently evaluate Plaintiff's dossier and
the additional materials provided by Plaintiff even though the ad hoc committee was provided with
Robertson's explanation of the Department's decision.  Following this court's careful review of the
record in this case, this court concludes that Plaintiff has not provided evidence that Defendants did
not believe the reasons given for denying tenure were true at the time Plaintiff was denied tenure.
See Lopez, 344 F. Supp. 2d at 621.

        After reviewing the extensive record in this case, including the deposition taken of Plaintiff,
this court has no doubt that Plaintiff, and others who supported his candidacy for tenure, sincerely
believe that Plaintiff was treated unfairly and was a victim of discrimination.  However, there simply
is no evidence in this case sufficient to raise a genuine issue of material fact on this issue, under
either the direct or indirect method of proof.  As the Seventh Circuit recently stated, "if the
subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create
genuine issues of material fact, then virtually all defense motions for summary judgment in such
cases would be doomed."  Mlynczak, 442 F.3d 1050, 2006 WL 851644, at *5.  Based upon the
evidence before this court, this court agrees with Defendants that Plaintiff has not shown any
genuine issue of material fact which requires a trial so that Defendants are entitled to summary

38

judgment on Plaintiff's claim of discrimination.

### III.  FIRST AMENDMENT CLAIMS

In Count II of his Amended Complaint, Plaintiff has alleged that Weaver, Daniel, Robertson, Herman, Averback and Greene violated his First Amendment rights.[9]  The First Amendment protects the freedom of speech and expressive conduct and generally prevents the government from proscribing such activities.  R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 382 (1992); Lopez, 344 F. Supp. 2d at 622.  To establish a claim for retaliation based on the First Amendment, Plaintiff must establish that (1) his speech was constitutionally protected, and (2) his constitutionally protected speech motivated the individual defendants' actions.  Lopez, 344 F. Supp. 2d at 622, citing Vukadinovich, 278 F.3d at 699.  "If these two elements are established, the burden shifts to the government to prove that their interest in efficient management outweighed the plaintiff's interest in freedom of expression, or that they would have taken the action regardless of the statement."  Miller v. Jones, ___ F.3d ___, 2006 WL 988046, at *5 (7th Cir. 2006).

To be protected, employee speech must relate to a matter of "political, social, or other concern to the community."  Miller v. Jones, 2006 WL 988046, at *5, quoting Connick v. Myers, 461 U.S. 138, 146 (1983).  In Connick, the Supreme Court held that when an "employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest . . . a federal court is not the appropriate forum in which to review the wisdom of the personnel decision taken by a public agency . . . ."  Miller 2006 WL 988046, at *5, quoting Connick, 461 U.S. at 147.  To determine whether the employee's speech was that of a citizen on

---

[9]  Plaintiff has stated that he has not asserted a cause of action against the Board of Trustees under 42 U.S.C. § 1983.

matters of public concern, a court looks to the content, form, and context of the statement.  <u>Miller</u>, 2006 WL 988046, at *5, <u>citing</u> <u>Connick</u>, 461 U.S. at 147-48.  Of these three, content is the most important.  <u>Miller</u>, 2006 WL 988046, at *5.  In evaluating these factors, courts look at whether the government employee sought to "bring to light actual or potential wrongdoing or breach of public trust."  <u>Miller</u>, 2006 WL 988046, at *5, <u>quoting</u> <u>Connick</u>, 461 U.S. at 148.  Not all matters that transpire in a government office are of public concern.  <u>Miller</u>, 2006 WL 988046, at *5, <u>citing</u> <u>Connick</u>, 461 U.S. at 149.  Instead, "public concern is the 'subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public. . . .'" <u>Miller</u>, 2006 WL 988046, at *5, <u>quoting</u> <u>City of San Diego v. Roe</u>, 543 U.S. 77, 83-84 (2004).  Whether the statement rises to the level of public concern is a question of law.  <u>Connick</u>, 461 U.S. at 148, n.7; <u>Miller</u>, 2006 WL 988046, at *5.

In this case, Defendants argue that Plaintiff's decision not to nominate Weaver for the Burnett Teacher of the Year award did not constitute speech on a matter of public concern.  They contend that it was not a matter of public concern whether Weaver or Averback won the Department's Teacher of the Year award.  Defendants point out that Plaintiff's allegedly protected speech related to a single, privately funded award which, although it may be important to the recipient, was of relatively small consequence to the general public.

In response, Plaintiff contends that this speech was of public concern because "educational improvement and fiscal responsibility in public schools clearly are matters of public concern," citing <u>Klug v. Chicago Sch. Reform Bd. of Trs.</u>, 197 F.3d 853, 858 (7th Cir. 1999).  Plaintiff noted that the award winner was announced in the College of Engineering and in other public forums and argues that this information was not only important to the recipient but also "to the current and future

students of the Department, their parents, and alumni who were concerned about the quality of teaching in a public institution."  In addition, Plaintiff has argued that his complaint to the Faculty Advisory Committee about Weaver's retaliation was also protected speech.

This court concludes that the issue of whether Plaintiff's speech constituted speech on a matter of public concern is a close one.  However, this court concludes that Plaintiff has persuasively argued that the Teacher of the Year award was publicized and was of interest to the public.  This court therefore concludes that Plaintiff's speech related to a "subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."  See Miller, 2006 WL 988046, at *5.  This court also agrees that Plaintiff's complaint to the Faculty Advisory Committee was protected speech.

Defendants also argue, however, that Plaintiff's alleged speech was not a motivating factor in denying him tenure, and that the University would have denied him tenure even in the absence of his speech.  Defendants point out that there is no evidence in the record that Weaver actually influenced even a single vote in the original decision.  Moreover, the original decision was subsequently reviewed at multiple levels, and there is no evidence that this review was affected by any retaliatory motive on the part of Weaver.  Defendants contend that no action of Weaver may be imputed to the final decision in this case.  Plaintiff argues, in response, that "Weaver played a critical and influential role in the decision to deny Plaintiff promotion and tenure because he made the initial recommendation against Plaintiff and there were no independent and substantive evaluations of Plaintiff's dossier after that recommendation."  This court agrees with Defendants' argument.

A causal link between the protected expression and an adverse employment action may be

41

established by showing that the protected conduct was a substantial or motivating factor in the employer's decision.  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). A "motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." Spiegla v. Hull, 371 F.3d 928, 942 (7th Cir. 2004).

This court agrees with Defendants that, in order to accept Plaintiff's argument that his speech was a motivating factor in the decision to deny him tenure, this court would have to infer that the Department's faculty were influenced by Weaver when they voted on October 2 and October 30, 2002, even though there is no evidence that anyone was so influenced.  This court would also have to infer that the faculty remained influenced by Weaver when they voted on July 8, 2003, even though Weaver did not attend the meeting and no longer had any ability to make decisions affecting them after he resigned as Department Head in January 2003.  Even assuming that this court could reasonably make those inferences, this court would then have to infer that all of the other individuals who evaluated Plaintiff's dossier after July 2003, including the College Promotion and Tenure Committee, Dean Daniel, the ad hoc committee, and Provost Herman, were unable to make an objective judgment about the strength of Plaintiff's qualifications because of the initial recommendation which was based upon Weaver's retaliatory motive.  This court agrees with Defendants that this scenario is simply and entirely implausible.  This court concludes that the evidence does not support Plaintiff's assertion that "once Weaver made the recommendation to deny Plaintiff promotion and tenure, there was not a single independent, fresh, and substantive review of Plaintiff's merits."  This court concludes that the extensive record in this case shows that Plaintiff's dossier was carefully evaluated multiple times and found insufficient to warrant tenure.  This court therefore agrees with Defendants that no reasonable interpretation of the facts could support the

42

contention that any alleged grudge Weaver held against Plaintiff because of the Burnett Teacher of the Year Award infected the final decision.

Plaintiff has also argued that Robertson was motivated to retaliate against Plaintiff because of Plaintiff's complaint to the Faculty Advisory Committee, which Robertson told Plaintiff was an attack on the Department, and that the other individual Defendants either participated in the retaliation or did nothing to stop it. Plaintiff argues that Robertson's retaliatory motivation is demonstrated by his attempt to remove Plaintiff from the committee deciding the recipient of the Burnett teaching award in 2003, by his demand for confidentiality at the July 8, 2003, meeting, by his decision not to update Plaintiff's dossier before the meeting, by his decision not to appoint an external committee to review Plaintiff's dossier, and by his strongly worded recommendation to deny Plaintiff promotion and tenure. This court concludes, after its careful review of the record in this case, that it would be a stretch for a trier of fact to decide that Robertson's actions were motivated by a retaliation.[10] However, even if this court assumed that Robertson had a retaliatory motivation in taking these actions, there is no evidence that the subsequent reviews of Plaintiff's dossier after the July 2003 recommendation were in any way motivated by retaliation because of Plaintiff's complaint to the Faculty Advisory Committee.

Based upon this record, this court finds that only one conclusion can be reached, that Plaintiff's protected speech was not a motivating factor in the decision to deny him tenure and

---

[10] This court notes that it agrees with Defendants that Robertson, at his deposition, provided legitimate reasons for asking Plaintiff to resign from the Burnett Teacher of the Year Award selection committee. Moreover, the record shows that, when Plaintiff objected, Robertson allowed him to remain on the selection committee. This court also agrees that there was nothing sinister in Robertson's concern that deliberations regarding personnel decisions be kept confidential and that Robertson provided a reasonable explanation for all of his actions in this case.

promotion. Accordingly, this court agrees with Defendants that Plaintiff has not shown that there

is a genuine issue of material fact regarding this claim that requires a trial. Therefore, Defendants

are entitled to summary judgment on Plaintiff's claim of retaliation.

REMAINING RELATED MOTIONS

I.  DEFENDANT HERMAN'S MOTION TO CORRECT

On December 29, 2005, Defendant Herman filed a Motion to Correct Typographical Error

in his Reply (#127). Plaintiff has not responded to this Motion, so this court presumes there is no

opposition. Accordingly, Defendant Herman's Motion to Correct (#127) is GRANTED.

II.  MOTIONS TO STRIKE

This court first notes that motions to strike are disfavored. See Clegg v. The Sullivan Corp.,

2003 WL 21254558, at *1 (S.D. Ind. 2003). Therefore, generally, it is not this court's practice to

grant motions to strike when ruling on motions for summary judgment. See Fenje v. Feld, 301 F.

Supp. 2d 781, 789 (N.D. Ill. 2003).

A.  DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S AFFIDAVIT

On December 19, 2006, Defendants filed their Motion to Strike Plaintiff's Affidavit (#123).

Defendants noted that Plaintiff filed his Affidavit on December 2, 2005, in support of his Responses

to Defendants' Motions for Summary Judgment. In his Affidavit, Plaintiff stated that he interviewed

for a position at the Lawrence Livermore National Laboratory and a position at the University of

Florida at Gainesville, Florida. Plaintiff stated that he was not hired for either position.

Defendants state that Plaintiff has offered these statements to suggest that he was somehow

"blackballed" from employment by one or more Defendants. Defendants argue that this is

44

inadmissible hearsay and that the only competent testimony in this case concerning Plaintiff's employment prospects is Plaintiff's deposition testimony that he was offered a job as a tenure-track professor at Virginia Tech University and turned it down.

On December 22, 2005, Plaintiff filed his Response to Defendants' Motion to Strike (#126). Plaintiff argues that the statements in his affidavit are not inadmissible hearsay because they are testimony based on his own direct knowledge of the facts.

This court has considered the statements in Plaintiff's affidavit and concludes that they have no relevance to Plaintiff's claim of discrimination and First Amendment retaliation.  Accordingly, Defendants' Motion to Strike Plaintiff's Affidavit (#123) is DENIED as moot.

### III.  PLAINTIFF'S MOTION TO STRIKE

On December 20, 2006, Plaintiff filed a Motion to Strike Portions of the Replies filed by Defendants Greene and Board of Trustees (#125).  Plaintiff stated that Defendant Greene stated in his Reply that "Greene supported hiring Plaintiff in the first instance, and was instrumental in bringing Jian-Min Zuo, also Chinese, to the Department."  Plaintiff also noted that Defendant Greene stated "Plaintiff also fails to note that Greene was just as influential when Plaintiff was hired, but approved Plaintiff's hiring."  Plaintiff stated that Defendant Board of Trustees similarly raised the same-actor defense in its Reply Brief.  In addition, Plaintiff complained that Greene stated the following in his Reply:

> The Plaintiff likewise ignores the fact that since Greene left, two
> Chinese members of the Department of Materials Science &
> Engineering, Jian-Min Zuo (recruited by Greene) and David [sic]
> Wong, have received positive recommendations for tenure from the

Department. (Schweizer Dep. p. 70). Therefore, three of the four Chinese candidates for tenure in the Department of Materials Science at the University of Illinois have received tenure, or are about to. There is no basis for asserting any statistical significance to the Plaintiff's unsuccessful candidacy.

Plaintiff pointed out that these promotion cases were pending as of Kenneth Schweizer's deposition on November 11, 2005. However, Plaintiff did not otherwise challenge the factual accuracy of the statements in Greene's Reply. Instead, Plaintiff argued that the statements should be stricken because they were arguments made for the first time in a Reply Brief, because the Seventh Circuit has "emphatically rejected the same-actor inference in the race-discrimination setting," and because the recent promotion cases referred to occurred nearly two years after the filing of this case.

On December 29, 2006, Defendants filed their Response to Plaintiff's Motion to Strike (#128). Defendants argued that the inferences in the Reply Briefs to the fact that Defendant Greene participated in the decision to hire Plaintiff and brought other Chinese to the Department was a legitimate response to the issues raised by Plaintiff in his Responses to the Motions for Summary Judgment. Defendants also disagreed with Plaintiff about Seventh Circuit case law regarding the same-actor inference and argued that Defendants' response was a legitimate rebuttal of Plaintiff's argument that this court should infer bias because Defendant Greene, in Plaintiff's judgment, did not have enough Chinese graduate students. Defendants also argued that the reference to the fact that, since Plaintiff's tenure application was considered, the Department has considered two other Chinese faculty members and recommended them for tenure was an appropriate response to Plaintiff's statistical analysis.

46

This court considered, but did not rely on, the additional facts included in Defendant Greene's and Defendant Board of Trustee's Reply Briefs in ruling on Defendants' Motions for Summary Judgment.  Accordingly, Plaintiff's Motion to Strike (#125) is also DENIED as moot.

IT IS THEREFORE ORDERED THAT:

(1) Defendants' Amended Motions for Summary Judgment (#97, #98, #99, #100, #101, #102, #103 ) are GRANTED.  Judgment is hereby entered in favor of Defendants and against Plaintiff.

(2) Defendant Herman's Motion to Amend Reply (#127) is GRANTED.

(3) Defendants' Motion to Strike Plaintiff's Affidavit (#123) is DENIED as moot.

(4) Plaintiff's Motion to Strike Portions of the Reply of Greene and the Board of Trustees (#125) is DENIED as moot.

(5) The Motions in Limine (#130, #131, #132, #133, #134, #135, #136, #137, #138, #139) filed by the parties are MOOT.

(6) This case is terminated.

ENTERED this 2nd day of May, 2006

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE

47